MAINE SUPREME JUDICIAL COURT                                   Reporter of Decisions
Decision:      2014 ME 63
Docket:        Cum-13-502
Argued:        April 9, 2014
Decided:       May 6, 2014

Panel:         SAUFLEY, C.J., and ALEXANDER, SILVER, MEAD, GORMAN, and JABAR, JJ.

FRIENDS OF CONGRESS SQUARE PARK et al.

v.

CITY OF PORTLAND

GORMAN, J.

[¶1]  The City of Portland appeals from a judgment entered in the Superior Court (Cumberland County, *Wheeler, J.*), pursuant to M.R. Civ. P. 80B, ordering the City to issue petition forms for a citizens' initiative submitted by Friends of Congress Square Park and four Portland residents[1] to amend the City's land bank ordinance.  Because the proposed amendments are legislative, we conclude that the citizens' initiative powers extend to them, and we affirm the judgment.

## I.  BACKGROUND

[¶2]  In August of 2012, the City entered into negotiations to sell a portion of Congress Square Park, an approximately 14,300-square-foot urban park in the

---

[1] Friends of Congress Square Park is a Maine nonprofit corporation incorporated in 2013.  The other appellees—Frank Turek, David LaCasse, Herbert Adams, and Patricia O'Donnell—are residents of Portland.  The plaintiffs-appellees are collectively referred to as "Friends."

2

City's ownership. Friends was established to oppose the planned sale of the Park and to find ways to protect other urban open spaces in Portland.

[¶3] On September 6, 2013, Friends filed with the City Clerk a "direct initiation of legislation," also known as a "citizens' initiative," to amend the City's land bank ordinance.[2] The proposed amendments would create a new category of land bank property called "urban open public spaces" and designate thirty-five parcels, including Congress Square Park, as belonging in that category. The amendments would also require the approval of eight of nine members of the City Council—or, alternatively, the vote of six members of the City Council, a favorable recommendation from the land bank commission, and a majority vote in a municipal election—in order to dispose of property in the land bank. Because Friends attached a retroactivity clause to the proposal, the amendments would become effective as of the filing date of the citizens' initiative, September 6, 2013, should it be approved by Portland voters.

[¶4] Friends submitted the initiative in accordance with the procedure in section 9-36 of the City Code. *See* Portland, Me., Code § 9-36 (Mar. 4, 1991). Section 9-36 directs the City Clerk, upon receipt of such an initiative, to prepare

---

[2] The City established the land bank, the land bank commission, and the land bank fund in 1999 "to ensure the conservation and preservation of limited open space with important wildlife, ecological, environmental, scenic or outdoor recreational values." Portland, Me., Code § 2-42(a) (Apr. 5, 1999). The parties refer to §§ 2-41 to 2-45 of the City Code as the "land bank ordinance," and we follow suit.

and return the official petition forms to the ten registered voters comprising the petitioners' committee so that the forms may be circulated for the collection of signatures. *See id.* § 9-36(c). If the requisite signatures are collected, the City must then hold a public hearing and must either enact the desired ordinance or place the initiative on a ballot. *See id*. § 9-36(f). On September 13, 2013, the City notified Friends that the City Clerk[3] would not issue the petition forms because, inter alia, the proposed amendments do not affect any legislative matters. Three days later, the City Council approved, by a six-to-three vote, the sale of 9500 square feet of Congress Square Park. The approval is in compliance with the existing City Code,[4] but it would not satisfy the proposed amendments.

[¶5] On September 25, 2013, Friends filed a complaint in the Superior Court requesting a judicial review of the City's refusal to issue the petition forms pursuant to M.R. Civ. P. 80B (Count I); seeking a declaration pursuant to the Declaratory Judgments Act, 14 M.R.S. §§ 5954, 5960 (2013), that the petition is the proper subject of a citizens' initiative (Count II); and claiming that the City's

---

[3] The City Clerk does not have express authority to reject citizens' initiative proposals submitted in compliance with the petition procedure in the City Code on grounds that they are not legislative. *See* Portland, Me., Code § 9-36 (Mar. 4, 1991.) Friends did not raise this issue on appeal. It is therefore waived. *See Mehlhorn v. Derby*, 2006 ME 110, ¶ 11, 905 A.2d 290.

[4] Under current law, the disposition of City-owned property not in the land bank requires the approval of five members of the City Council. *See* Portland, Me., Charter art. II, § 11 (2013). The disposition of land bank property requires a positive recommendation of the land bank commission and the approval of six members of the Council. *See* Portland, Me., Code § 2-43(c) (Apr. 5, 1999). Because Congress Square Park is not a land bank property, a majority Council vote was enough to proceed with the sale.

4

refusal to issue the forms violated the petitioners' constitutionally protected right to free speech pursuant to 42 U.S.C.A. § 1983 (West, Westlaw through P.L. 113-92 (excluding P.L 113-76, 113-79, and 113-89), approved Mar. 25, 2014)) (Count III). Friends also filed a motion for injunctive relief seeking to compel the City to issue the forms. On October 31, 2013, the court entered a summary judgment in favor of Friends on Counts I and II, and entered a permanent injunction requiring the City to issue the petition forms.[5] The City filed a motion to stay the permanent injunction, which the court denied.

[¶6] The City filed a timely appeal.

## II. DISCUSSION

[¶7] We review municipal decisions directly, without deference to the Superior Court's ruling on the intermediate appeal. *D'Alessandro v. Town of Harpswell*, 2012 ME 89, ¶ 5, 48 A.3d 786. Because this appeal raises solely legal issues concerning the interpretation of the City Code, we review de novo for errors of law the City's refusal to issue the petition forms to Friends. *See id*.

---

[5] The parties stipulated that the City is liable on Count III pursuant to 42 U.S.C.A. § 1983 (West, Westlaw through P.L. 113-92 (excluding P.L 113-76, 113-79, and 113-89), approved Mar. 25, 2014) if the Superior Court judgment on Counts I and II is affirmed, leaving unresolved only the award of attorney fees pursuant to 42 U.S.C.A. § 1988 (West, Westlaw through P.L. 113-92 (excluding P.L. 113-76, 113-79, and 113-89), approved Mar. 25, 2014). The court's judgment on Counts I and II was therefore a final judgment. *See* M.R. Civ. P. 54(b)(2) (stating that, in an action in which there is a claim for attorney fees, a judgment entered on all other claims shall be final as to those claims unless the court otherwise finds).

[¶8]  The City contends that the initiative is not authorized by the City Code because the Code restricts initiatives to legislative matters and the proposed amendments are administrative.[6]  The Code provides, in pertinent part:

> The submission to the vote of the people of any proposed ordinance *dealing with legislative matters on municipal affairs* or of any such ordinance enacted by the city council and which has not yet gone into effect may be accomplished by the presentation of a petition therefor to the city council . . . .

Portland, Me., Code § 9-36(a) (emphasis added).  Nowhere in the City Code is the term "legislative" defined.

[¶9]  We examine an ordinance for its plain meaning.  *D'Alessandro*, 2012 ME 89, ¶ 5, 48 A.3d 786.  We construe undefined or ambiguous terms "reasonably with regard to both the objects sought to be obtained and to the general structure of the ordinance as a whole," *Adams v. Town of Brunswick*, 2010 ME 7, ¶ 11, 987 A.2d 502, and give such terms their "common and generally accepted meaning unless indicated otherwise by their context in the ordinance," *Jade Realty Corp. v. Town of Eliot*, 2008 ME 80, ¶ 7, 946 A.2d 408.  We often rely on dictionary definitions to determine the common and generally accepted meaning of undefined or ambiguous terms.  *Bangs v. Town of Wells*, 2000 ME 186, ¶ 19 n. 9, 760 A.2d 632.  We liberally construe grants of initiative and referendum

---

[6]  The City also contends that the amendments constitute an appropriation and are an invalid exercise of the people's veto powers pursuant to the City Code.  We find these arguments unpersuasive.

6

powers so as to "facilitate, rather than to handicap, the people's exercise of their sovereign power to legislate." *Allen v. Quinn*, 459 A.2d 1098, 1102-03 (Me. 1983); *see also McGee v. Sec'y of State*, 2006 ME 50, ¶ 25, 896 A.2d 933 ("The broad purpose of the direct initiative is the encouragement of participatory democracy.").

[¶10] As a preliminary matter, we interpret the plain language of the City Code to mean that the scope of the initiative power is limited to those initiatives affecting legislative matters, as opposed to administrative matters. Our interpretation today flows naturally from our analysis in *LaFleur ex rel. Anderson v. Frost*, 146 Me. 270, 80 A.2d 407 (1951). In *LaFleur*, petitioners sought to enact an ordinance establishing referendum and initiative powers in the City of Portland that reached all municipal affairs. *Id.* at 272, 290-91. The City Council, however, enacted a different ordinance—the precursor to section 9-36(a)—limiting these powers to "legislative matters on municipal affairs." *Id.* at 278. In upholding the validity of the City Council's actions, we stated that the newly adopted scope of the initiative and referendum powers extended "not to all of the municipal affairs but to *certain of* the municipal affairs" and thereby gave meaning to the words "legislative matters." *Id.* at 283 (emphasis added); *cf. Blue Yonder, LLC v. State Tax Assessor*, 2011 ME 49, ¶ 13, 17 A.3d 667 (stating that we will not interpret a

statute "in a manner that would render some of the language superfluous and meaningless").

[¶11] We next turn to whether the proposed amendments are legislative or administrative. The City concedes that the addition of a category of "urban open public spaces" to the land bank ordinance would set new policy, making such an act legislative and thereby falling within the permitted scope for direct initiation of legislation. It contends, however, that the remaining amendments proposed by Friends—particularly the immediate designation of thirty-five properties as land bank properties—are administrative because they circumvent the existing "vetting process" by which the land bank commission identifies prospective land bank properties in cooperation with City departments and members of the public and then makes recommendations to the City Council based on the information gathered during that process. The City essentially argues that, because these amendments seek to substitute the judgment of the voters for that of persons "truly qualified to be making decisions regarding land bank property," they are impermissibly administrative.

[¶12] Both parties draw largely from extra-jurisdictional case law to argue their respective positions. This is because, to date, we have only had occasion to state, in dictum, that where a "municipality has been given the discretion to do as it wishes . . . the action of the municipality's legislative body is subject to the

referendum procedure," regardless of whether the inquiry is premised on "municipal versus state affairs or legislative versus administrative duties." *Albert v. Town of Fairfield,* 597 A.2d 1353, 1355 (Me. 1991) (holding that a town council's acceptance of land for a town way was a municipal affair subject to referendum powers, as opposed to a state affair). Our statement in *Albert* is consistent with the generally accepted definition of "legislative power" as the "power to make laws and to alter them." Black's Law Dictionary 983 (9th ed. 2009). Discretion is likewise a consideration in other jurisdictions that have attempted to discern legislative from administrative matters. *See* 5 Eugene McQuillin, The Law of Municipal Corporations § 16:53 (3d ed. 1978) (stating that "[w]here discretion is left to the local government as to what it may do, when the local government acts, it acts legislatively").

[¶13] Because "no single act of a governing body is ever likely to be solely legislative or solely administrative," however, courts have struggled to separate discretionary legislative acts from administrative acts. *McAlister v. City of Fairway*, 212 P.3d 184, 194 (Kan. 2009). In their attempts to draw distinctions, courts have considered a variety of factors.[7] Although no single factor has been

---

[7] For example, courts consider an act to be legislative if it: (1) makes new law, rather than executes existing law, *see McAlister v. City of Fairway*, 212 P.3d 184, 194 (Kan. 2009); *Kearney v. City of Little Rock*, 302 S.W.3d 629, 634 (Ark. Ct. App. 2009); *State ex rel. Upper Arlington v. Franklin Cnty. Bd. of Elections*, 895 N.E.2d 177, 181 (Ohio 2008); (2) proposes a law of general applicability, rather than being based on individualized, case-specific considerations, *see Carter v. Lehi City,* 269 P.3d 141, 154

universally accepted or found to control the outcome of a controversy, the City's contention that the amendments are administrative is not persuasive when evaluated against any of them.

[¶14] The amendments deal with matters that are entirely within the discretion of the City's legislative body, the City Council. Moreover, the Council has never delegated its authority to establish the process by which properties are added to or removed from the land bank. Although the land bank commission may recommend the inclusion or exclusion of property from the land bank, the ultimate authority to acquire or dispose of such property remains with the Council. The Council has the undelegated and exclusive power to make laws that not only declare the purpose of the land bank ordinance but also laws that establish the ways and means—the process—by which that purpose is achieved. It also has the power to amend those laws at its discretion. *See* Black's Law Dictionary 983

---

(Utah 2012); (3) relates to subjects of a permanent or general character, as opposed to subjects that are temporary in operation and effect, *see Vagneur v. City of Aspen*, 295 P.3d 493, 505 (Colo. 2013); (4) declares a public purpose and provides for the ways and means to accomplish that purpose, rather than implementing existing policy or dealing with a small segment of an overall policy question, *see McAlister*, 212 P.3d at 194; (5) requires only general knowledge, rather than specialized training and experience or an intimate knowledge of the fiscal or other affairs of government, *see id.*; (6) does not involve a subject matter in which the legislative body has delegated decisionmaking power for local implementation, *see id.* at 195; *see also* 5 Eugene McQuillin, The Law of Municipal Corporations § 16:53 (3d ed. 1978); (7) establishes or amends zoning laws, *see Friends of Denver Parks, Inc. v. City and Cnty. of Denver*, 2013 WL 6814985, --- P.3d. --- (Colo. App. 2013); *but see Vagneur*, 295 P.3d at 510 (stating that the change in use of particular parcels are case-specific action that "generally do not reflect the exercise of legislative power"); (8) is informed by historical examples of legislative acts, such as longstanding parallels in statutes enacted by legislative bodies, rather than traditionally executive acts, *see Carter,* 269 P.3d at 155; or (9) is an amendment to a legislative act, *see Vagneur,* 295 P.3d at 505 (presuming that "where an original act is legislative, an amendment to that act is likewise legislative").

(defining "legislative power" as the "power to make laws and to alter them"); *see also McAlister,* 212 P.3d at 194 (stating that "[a]cts that declare [a] public purpose and provide ways and means to accomplish that purpose" are generally considered legislative). The amendments proposed by Friends would declare a new public purpose: the protection of a new category of open space. The amendments would also establish the ways and means to achieve that purpose: the immediate inclusion of thirty-five properties in the land bank and the imposition of a new process for removing any properties from the land bank. We are not persuaded that this proposed act should be characterized differently than the original legislative act that declared a public purpose to protect certain types of open space and set forth a process to achieve it. *See Vagneur v. City of Aspen*, 295 P.3d 493, 505 (Colo. 2013) (stating that "where an original act is legislative, an amendment to that act is likewise legislative").

[¶15] In addition, the Friends' initiative proposes a law of general applicability rather than one based on individualized, case-specific considerations. *See Carter v. Lehi City,* 269 P.3d 141, 154 (Utah 2012). Although Friends acknowledges that its formation was motivated by the City's efforts to sell Congress Square Park, its initiative does not solely involve the Park: the amendments would add many other properties to the land bank, including some of the City's most heavily used open spaces. Indeed, there is no meaningful

difference between the designation of parcels as land bank properties and the legislative adoption of a zoning scheme that creates open space districts and lists specific parks by name for inclusion within those districts. *See, e.g.,* Boston, Mass., Zoning Code, vol. I, art. 33, §§ 33-5, 33-17 (2014) (establishing open space districts, including "Community Garden," "Parkland," "Recreation," and "Urban Plaza" subdistricts, and including a list of so-designated existing city parks). In both instances, the decisions involve making land use choices based on competing policy considerations—a task best suited for legislative bodies. *See Summerwind Cottage, LLC v. Town of Scarborough,* 2013 ME 26, ¶ 9, 61 A.3d 698 (stating that the drawing of zoning boundaries is a legislative, not an administrative, function).

[¶16] Finally, and most significantly, although courts rely on wide-ranging considerations to determine whether acts are legislative or administrative, when courts focus on the *effects* of the exercise of the initiative power rather than the intrinsic characteristics of the act in question, there appears to be a consensus: an act exceeds the scope of the initiative power if it compels or bars action by elected officials that would seriously hamper governmental functions. *See* 5 Eugene McQuillin, The Law of Municipal Corporations § 16:53; *see also* 62 C.J.S. *Municipal Corporations* § 386 (2014) (stating that initiative powers "should not be so interpreted as to destroy or impair the efficacy of some other governmental power.")

[¶17] This final point does not rely on metaphysical attempts to determine the "true character" of the acts at issue, but is based on the practical policy underlying the substantive law. As the City correctly explains, the rationale for circumscribing participatory democracy is to avoid "destroy[ing] the efficient administration of government." *See* 42 Am. Jur. 2d *Initiative and Referendum* § 8 (2014). Indeed, the exemption of administrative matters from referendum and initiative powers "grows out of the recognized need of local governments to engage in their ordinary business with some degree of insulation from the disruptive effects of public participation." Jeff C. Wolfstone, *The Case for a Procedural Due Process Limitation on the Zoning Referendum: City of Eastlake Revisited*, 7 Ecol. L. Q. 51, 85 (1978). Limiting the types of issues that may be addressed through direct citizen action "reflects an often unspoken policy assumption that the need for efficient government outweighs the added value of public participation." *Id.*

[¶18] Here, nothing within the amendments proposed by Friends would seriously impede the day-to-day operations of the City, the City Council, or even the land bank commission. The immediate inclusion of thirty-five City-owned properties in the land bank does not force any burdensome responsibilities onto the land bank commission, and not every City Council decision to include, transfer, or dispose of property in the land bank would have to be taken to the voters. The

more stringent voting process would be triggered only if the City attempts to dispose of land bank property without garnering eight votes of the City Council—a scenario not likely to occur so regularly that it would destroy or disrupt the City's efficient functioning.

[¶19] In light of our liberal construction of grants of referendum and initiative powers and the policy rationale for limiting those powers, we hold as a matter of law that the amendments proposed by Friends are within the scope of the citizens' initiative power pursuant to section 9-36(a) of the City Code.

The entry is:

> Judgment affirmed. Remanded to the Superior Court for a determination of attorney fees pursuant to 42 U.S.C.A. § 1988 (West, Westlaw through P.L. 113-92 (excluding P.L. 113-76, 113-79, and 113-89), approved Mar. 25, 2014)).

**On the briefs:**

Danielle West-Chuhta, Esq., and Jennifer Thompson, Esq., City of Portland, Portland, for appellant City of Portland

Sarah A. McDaniel, Esq. Douglas McDaniel Campo & Schools LLC, PA, Westbrook, and Robert H. Levin, Esq., Portland, for appellees Friends of Congress Square Park, Frank R. Turek, David R. LaCasse, Herbert C. Adams, and Patricia M. O'Donnell

**At oral argument:**

Jennifer Thompson, Esq., for appellant City of Portland

Sarah A. McDaniel, Esq. for appellees Friends of Congress Square Park, Frank R. Turek, David R. LaCasse, Herbert C. Adams, and Patricia M. O'Donnell